UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAUREL HILTON, a/k/a/ Laurie Hilton,<br><br>        Plaintiff,<br>  v.<br><br>TAMARA SAUNT, a/k/a Tammy Saunt; and<br>BARTHOLOMEW SAUNT and TAMARA<br>SAUNT,  Trustee of the Saunt Family Trust,<br><br>        Defendants. | Civil Action No.<br>3:22-cv-461 (CSH)<br><br><br><br>MARCH 4, 2025 |

**RULING AND JUDGMENT FOLLOWING BENCH TRIAL**

**HAIGHT, Senior District Judge:**

This diversity action was tried to the Court without a jury.  Counsel for the parties have argued the case and submitted post-trial briefs [Doc. 40 and 41].

The Court now enters this Ruling, which constitutes its "Findings of Fact" and "Conclusions of Law," pursuant to Federal Rule 52(a) of Civil Procedure.  A separate Judgment will be entered pursuant to Federal Rule 58 of Civil Procedure.

**I.   BACKGROUND**

Plaintiff  Laurel Hilton is the younger sister of the principal  Defendant,  Tamara Saunt.  I will hereinafter refer to  these parties by the names they have used throughout:  "Laurie" for the Plaintiff, and "Tammy" for the Defendant.

Plaintiff Laurie is a citizen of Connecticut.  Defendant Tammy is a citizen of California. Laurie seeks a judgment against Tammy in the amount of $330,000.  The case accordingly falls

within this Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

The occurrences giving rise to this litigation began in April of 2018. At that time, the sisters, Laurie and Tammy, were seemingly fond of each other. They maintained telephone contact between them— Laurie in Connecticut and Tammy in California. This sibling familial harmony did not survive subsequent intervening events, recounted herein, which gave rise to the present action.

Tammy, the owner of a company called Harmonic Entertainment, Inc., which arranged background musical scores for movies, knew of producers and publicists in that industry. Doc. 39 (Trial Transcript, 03/21/2024), at 325: 17 to 326: 6. Tammy on occasion asked her sister if Laurie (who had considerable personal assets) would be interested in investing in the production of a new movie. *Id.* at 328: 17-19.

Thus it came to pass that on April 2, 2018, Tammy sent an e-mail to Laurie [ Plaintiff's Ex. 1] which quoted an earlier e-mail to Tammy from one Josh Etting, a movie producer. Etting had there said to Tammy: "If you have anyone looking to invest around 700k-750k of equity into a film that's literally shooting [on] May 2nd, this might be for you." Etting's e-mail described a "psychological thriller" of a film called *Angel of Mine*.[1]

Tammy said, in her e-mail to Laurie: "Wondering if you want to be involved in this film– they are looking for $750,000 " but, Tammy added, she might be able to get half that amount from

---

[1] Summarizing the plot of the film, Etting wrote:

In the vein of *Black Swan* and *The Hand that Rocks the Cradle*, a divorced mother's life is turned upside down when she crosses paths with a young girl. As the mother's obsession with the little girl grows, her behavior becomes increasingly disturbing, which in turn brings deeply buried secrets to the surface.

Pl. Ex. 1, at 1.

another source. Pl. Ex. 1, at 1. Tammy said to Laurie in a follow-up e-mail on April 2: "It's late for you now so just call me tomorrow and I can explain what all this means." *Id.*

Laurie testified at trial, and I accept, that on the next day, April 3, 2018, she and Tammy discussed on the telephone a possible investment by Laurie in the proposed film, *Angel of Mine.* Doc. 39, at 20: 4-6, 10-12; at 21: 4-7. Laurie ultimately decided to send $350,000 to non-party producers of the film in Australia. *Id.* at 27: 19-20. Laurie intended this payment to be an investment in the film. *Id.* at 27: 16-22. As of the date of April 6, 2018, a written investor agreement was entered into between Laurie Hilton as the Investor and a non-party Australian company as Producer of the motion picture *Angel of Mine. Id.* at 27: 21 to 28: 7.

That agreement, which is in evidence as Defendant's Ex. F, recites that the amount of Laurie's investment is $350,000. Def. Ex. F ("Investor Agreement'"), at 2, "Terms and Conditions" ¶ 1 ("The Investment"). Under "Recitals," the investment's purpose is stated: to "fund a portion of the Production Financing" for the film. *Id.* at 1, "Recitals," para. 4. The agreement specifies the manners in which Laurie will receive returns on her investment. *Id.* at 3-4, "Terms and Conditions," ¶¶ 5-6. The agreement also specifies that Laurie (as the Investor) "acknowledges that the Investment is subject to an extreme degree of risk such that the entirety of the Investment may be lost and deemed unrecoverable." *Id.* at 5, ¶ 13. Laurie Hilton invested the sum of $350,000 with the non-party Australian producer in accordance with the terms of this agreement.[2] *Id.* at 2, ¶ 1.

The action at bar is not between Plaintiff Laurie Hilton and that Australian movie producer.

---

[2] Plaintiff seeks to recover the full movie investment from Tammy ($350,000), minus $20,000 (paid in two $10,000 installments) by Tammy to Laurie on September 26, 2020, and October 28, 2020. *See* Doc. 25, Ex. 3 (receipts for Paypal transactions from Tammy to Laurie). The total judgment Plaintiff seeks is thus $330,000.

3

Rather, Laurie is suing her sister, Defendant Tammy Saunt, a California citizen, to recover the $350,000 Laurie invested with the non-party producer, who as of the date of the last post-trial filing in this case, has not made any return to Laurie on Laurie's investment in the *Angel of Mine* film.[3]

This action was commenced by a complaint Laurie filed on March 29, 2022. Doc. 1. By leave of Court, granted in an opinion reported at 2023 WL 4366070, Laurie filed a second amended complaint against Tammy on July 11, 2023.[4] Doc. 25. That is the present operative pleading in the case.

Laurie alleges in her Second Amended Complaint that she invested $350,000 for the production of the film "pursuant to Defendant Saunt's oral and written representations that . . . [i]f Plaintiff did not receive a full return of her investment, Defendant Saunt would reimburse Plaintiff $350,000." Doc. 25, ¶¶ 9 and 9.c.

Laurie expanded on that allegation at trial. She testified that "prior to Plaintiff signing the Investor Agreement and investing in the Film, Plaintiff and Defendant had a telephone conversation while Plaintiff was standing in her kitchen" [and Tammy was in California]. Doc. 41 (Plaintiff's Post-Trial Brief), at 8 (quoting Trial Tr. [Doc. 39], at 86-87, 150-51). During that call, "Defendant represented to Plaintiff: 'She would pay me back personally, my entire investment, if I didn't get paid back from the movie.'" *Id.* (quoting Tr., at 150).

Laurie described in her trial testimony her telephone conversation with Tammy on April 3, 2018. Laurie testified that Tammy told her this proposed movie project was a higher risk situation

---

[3] *See* n.2 *supra*.

[4] *See Hilton v. Saunt*, No. 3:22-CV-461 (CSH), 2023 WL 4366070, at *2 (D. Conn. July 6, 2023).

than a previous project, "and then she made sure to mention, I can promise you this, that I will personally pay you back if the movie does not pay you back." Doc. 39 (Trial Tr.), at 22: 11-14. Laurie also gave this testimony at trial:

> Q. Would you have made the investment in this movie if your sister did not say that to you?
>
> A. No.

*Id*. at 22: 18-20.

Those contentions by Laurie Hilton bring us to a decisive factual dispute between these two now litigious sisters.

Tammy Saunt acknowledged, during her trial testimony, that in early April 2018, she brought a movie called *Angel of Mine* to Laurie's attention, as a project in which Laurie might consider investing. Doc. 39, at 248: 19-22, 249: 2-7. Tammy described further telephone conversations on that subject with Laurie during that month, Laurie's eventual investment of $350,000 in the movie, and a payment Laurie sent to the non-party producers in Australia, pursuant to the April 6, 2018, written investment agreement between Laurie and the producer. *Id.* at 249: 17 to 250: 6; 259: 18 to 260: 8.

However, during her trial testimony, Tammy specifically rejected Laurie's claim that, prior to Laurie signing the investment agreement to invest $350,000 with the non-party movie producer, Tammy had promised Laurie that she would reimburse Laurie for that amount if the movie producer ultimately failed to do so. On that point, Tammy testified on her direct examination::

> Q. Prior to your sister signing the investor agreement, did you make any representation that you – any representation with regard to the investment?

5

>A. No. I was primarily there to explain things to her.

. . .

>Q. Did you receive any benefit from your sister in – based on her investment?

>A. No.

>Q. So you sister's testimony that you guaranteed her investment before she signed this agreement is untrue?

>A. Is untrue.

>Q. Okay.

>A. I would not – I didn't have the money, and she knew I didn't have the money, so I could not guarantee anything.

>Q. Okay.

>A. I didn't even have a job.

*Id.* at 254: 25 to 255: 4, 255: 14-25.

Tammy expanded on that point later in her direct examination:

>Q. In fact, until you got served with this lawsuit, had you heard your sister ever say anything about you guaranteeing that money on a phone call in April of 2018?

>A. Never. No. I was just trying to make her feel better after the fact when she was stressed out about losing all the money.

>I was trying – I didn't even have a job, but I was trying to do what I could to make her feel better.

>Q. But let's talk about when she was investing. Did you make any representations about her getting her money back?

>A. No. I never did.

>Q. You never made any representations or you never made any

6

>    guarantee?
>
>    A. I never made a guarantee. I mean, of course I was optimistic that the movie would do well. And I said, I hope it does – we all hope it does well. If it does well, you'll get your money back.
>
>    Q. "If"?
>
>    A. Yes.

*Id.* at 280: 6-25.

Tammy's Post-Trial Brief [Doc. 40] recounts Laurie's increasing agitation at the movie producing company's failure to generate any return on her investment. Tammy argues in her brief that if she had in fact guaranteed the return of Laurie's investment, there would have been no need for Laurie to worry about being reimbursed. Doc. 40 (Defendant's Post-Trial Brief), at 11. Tammy continues: if she had guaranteed Laurie's investment, "there would be no need for such panic" on Laurie's part; however, "*there was no kitchen agreement.*" *Id*. (emphasis added). I take this to be a reference by Tammy to Laurie's testimony that on April 3, 2018, during a telephone conversation while Laurie was in her kitchen in Connecticut, Tammy promised to reimburse Laurie's $350,000 investment if the movie producer did not. Doc. 39, at 116: 7-11, 17-18; 119: 7-11; 126: 1-21.

Tammy specifically denies having given Laurie that pre-investment undertaking. The thrust of Tammy's argument is that Laurie falsely ascribed a pre-investment guarantee of repayment by Tammy because of Laurie's increasing concern that the Australian movie producers, who had received Laurie's investment, were not going to pay it back. Tammy's brief continues: "The reason the plaintiff [Laurie] was panicked was she did not like the answers she was getting from the production company about when she would receive a return on her investment." Doc. 40, at 11.

## II. THE CLAIMS ASSERTED BY PLAINTIFF

Laurie's Second Amended Complaint (also "SAC" herein) against Tammy contains four causes of action. Doc. 25.

The first cause of action is for the tort of negligent misrepresentation. Under Connecticut law, the elements of a negligent misrepresentation claim follow the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Foy v. Pratt & Whitney Grp.*, 127 F.3d 229, 233 (2d Cir. 1997) (citing *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 575, 657 A.2d 212 (1995) (quoting Restatement (Second) of Torts (1977)); *see also D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 202 Conn. 206, 218, 520 A.2d 217, 223 (1987). Put simply, to prevail on a claim of negligent misrepresentation, a plaintiff must prove that (1) the defendant actually made a misrepresentation; (2) the defendant knew, should have known, or had the means of knowing that the statement was not true; and (3) plaintiff justifiably and detrimentally relied on the misrepresentation. *Foy,* 127 F.3d at 233.

In the case at bar, the negligent misrepresentation count alleges that Defendant Tammy Saunt made negligent misrepresentations to Plaintiff Laurie Hilton with respect to non-parties' production and release of the film *Angel of Mine,* and the timing of those non-parties' return to Laurie of her $350,000 investment in the film, plus interest. Specifically, the SAC alleges that Tammy made factual representations "[p]rior to Plaintiff's investment," Laurie invested in the film "pursuant to Defendant Saunt's factual representations," and Saunt's "pre-investment representations were in fact

8

false" in specified ways. Doc. 25, ¶¶ 19-23.

Plaintiff's second cause of action sounds in breach of contract. Pursuant to Connecticut state law, "[i]t is well established that a breach of contract claim . . . requires proving four elements: (1) formation of an agreement, (2) performance by one party, (3) breach of an agreement by the other party, and (4) damages." *United States Reg'l Econ. Dev. Auth., LLC v. Matthews*, No. 3:16-CV-01093 (CSH), 2017 WL 1398320, at *4 (D. Conn. Apr. 17, 2017) (collecting cases).

In the present case, the SAC alleges that "[o]n November 19, 2019, Defendant Tammy Saunt emailed Plaintiff Laurie Hilton and represented the following:

> What I can promise you is that you WILL get paid back. If the movie fund doesn't pay you back by next Christmas (not this Christmas but Christmas 2020) I will personally pay you all the money you are owed.

Doc. 25, ¶ 26 (emphasis in original) (quoting email from Tammy to Laurie, 11/19/2019, Ex. 4 to SAC).

The SAC then alleges that on January 20, 2021, Tammy sent Laurie an email (Ex. 5) which says in part: "Will hopefully maybe be able to pay you end of month from my part time income." *Id.* ¶ 27 (quoting Ex. 5 to SAC).

In the following paragraph of the SAC (¶ 28), Laurie asserts that the emails referenced in the two previous paragraphs (¶¶ 26 and 27), Exhibits 4 and 5, constitute "a written codification of a valid contract wherein Plaintiff [Laurie] agreed to invest in the Film pursuant to Defendant [Tammy] Saunt's representations that said investment would be returned with interest upon the Film's release on an at-home streaming platform." *Id.* ¶ 28. Plaintiff then concludes that Tammy "is in breach of contract by failing to personally pay Plaintiff all the money Plaintiff is owed." *Id.* ¶ 29 (quoting Ex. 4 to SAC)(internal quotation marks and brackets omitted).

9

The SAC's third cause of action, against Tammy, is for a fraudulent transfer of real property by Tammy. "To prove actual fraudulent transfer under section 52-552e(a)(1) of the Connecticut General Statutes, the Receiver must ultimately prove (1) that a transfer of assets took place, (2) that the claim arose before that transfer took place, and (3) that the transferor intended to hinder, delay or defraud the creditor by making the transfer." *Carney v. Horion Invs. Ltd.,* 107 F. Supp. 3d 216, 231 (D. Conn. 2015). In addition, to prove "constructive fraudulent transfer" under Conn. Gen. Stat. § 52-552e(a)(2), one must prove "both that the transferor did not receive reasonably equivalent value in exchange for the transfer and that he was insolvent at [the] time [of the transfer] or ... became insolvent as a result of the transfer." *Carney,* 107 F. Supp. 3d at 231-32 (citation and internal quotation marks omitted).[5]

Here, Plaintiff's SAC alleges that Tammy was notified of the pendency of this action by service of a summons and complaint on April 21, 2022, and on May 20, 2022, transferred title to real property located at 1909 Clark Lane, Unit A in Redondo Beach, California ("Redondo Beach Property") to the "Saunt Family Trust" for "no consideration," "with the actual intent to hinder,

---

[5] Conn. Gen. Stat. § 52-552e states in relevant part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

*Id.* at § 52-552e (a)(1)-(2).

delay, and /or defraud Plaintiff" in collecting the amount sued for in this action. Doc. 25, at ¶¶ 33-37; Ex. 7 to SAC ("Quitclaim Deed" and "Deed of Trust/Condominium Rider"). Accordingly, this transfer allegedly violated Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552a *et seq*. Doc. 25, ¶ 37.

The SAC's fourth cause of action is against Tammy Saunt and Bartholomew Saunt, collectively, as Trustee of the Saunt Family Trust. That count alleges that the Trust received the fraudulent transfer of real property as alleged in the third cause of action, with knowledge of that transfer's fraudulent nature. Doc. 25, ¶¶ 39-44. By "facilitating [Tammy's] transfer of the Redondo Beach Property to the Saunt Family Trust on May 20, 2022," the Trustee of the Saunt Family Trust allegedly violated Connecticut's Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552a *et seq*. Doc. 25, ¶ 44.

### III.   DISCUSSION

**A.   The Parties' Contentions**

Much of this case turns upon the question of whether, before Plaintiff Laurel Hilton invested $350,000 with non-party movie producers to help fund the film *Angel of Mine*, Defendant Tamara Saunt told Hilton she would repay that amount to her if the producers failed to do so.

The case for Plaintiff Laurie is that Defendant Tammy gave her that return-of-investment undertaking during a telephone conversation between the two sisters on April 3, 2018. Laurie says that she would not have made the investment with the non-party movie producers without having first received Tammy's personal guarantee that the investment would be repaid. In point of fact, Laurie invested $350,000 with non-party movie producers; the producers have failed to return Laurie's investment and the interest thereon; and Tammy, Laurie contends, has now become liable

to Laurie for a return of the $350,000 Laurie invested.

The case for Defendant Tammy is that she said nothing to Plaintiff Laurie about repaying Laurie's investment *before* Laurie decided to invest $350,000 with the non-party movie producers. In Tammy's submission, the possibility of Tammy repaying Laurie's investment was mentioned at a later time, under circumstances which place Tammy under no obligation to make that repayment to Laurie. Tammy seeks a judgment dismissing Laurie's complaint against her.

While the phrasing of Plaintiff's Second Amended Complaint is imprecise on the point, the record makes plain Laurie's contention, as recited *supra*, that Tammy guaranteed the return of Laurie's $350,000 investment *before* April 6, 2018, the date when Laurie actually agreed to invest that sum with the film producers. That sequence of events is described in Laurie's Post-Trial Brief as follows:

> Plaintiff has proven, by a preponderance of the evidence, that *prior to Plaintiff's investment*, Plaintiff and Defendant reached an agreement wherein Defendant would personally guarantee Plaintiff's investment should Plaintiff not receive a full return of her investment from the producers. . . .
>
> While there is no transcript of the phone calls that occurred between April 3, 2018, and April 12, 2018, *the terms of the pre-investment oral contract* are discernible from the parties' testimony and physical evidence.[6]

Doc. 41, at 15 (emphases added).

This is "the pre-investment oral contract" allegedly reached during the kitchen telephone call between Laurie and Tammy on April 3, 2018 which Laurie says was the subject of a "codification" by Tammy's e-mails to Laurie on November 19, 2019, and January 20, 2021. Doc. 25, ¶¶ 26-28, and

---

[6] In Laurie's words, there is no written contract with Tammy because "[s]he's my sister" and "I take her for her word." Doc. 41, at 15 n.8 (citing Doc. 39, at 29: 14-17).

Ex. 4 & 5 to SAC. Laurie testified at trial that Tammy's guarantee of personal payment in her November 19, 2019, email was "almost verbatim [to] what she said to me on the phone," by which Laurie meant "when we spoke on the phone prior to the investment." Doc. 39, at 31:8 to 32:15.

Laurie's testimony at trial initially identified April 3, 2018, as the date of her telephone conversation with Tammy containing the return-of-investment undertaking. Doc. 39, at 20: 4-6. During cross-examination, Laurie expressed uncertainty as to the precise date of that conversation, but adhered to her account of the conversation's substance and relative timing. Laurie testified in response to questions by Tammy's counsel:

> Q. You got an e-mail from your sister, here's a movie offer. You get excited. She said, well, you better get a lawyer. Then you get a lawyer, you sign the investment agreement, and then you have the kitchen agreement with your sister?
>
> A. No, no.
>
> Q. Okay. But you said it was the day before you signed the agreement?
>
> A. All I know is she made the promise, and then I had the agreement drawn up.
>
> . . .
>
> Q. [S]o we have no idea what date you made this kitchen agreement; correct?
>
> A. Correct. I don't know which phone call it was.
>
> Q. Okay. So we don't know if it was before you signed the investor agreement or after you signed the investor agreement?
>
> A. It was before. It was definitely before I signed an agreement. Definitely before I signed an agreement.

Doc. 39, at 89: 11-20, 90: 6-14.

13

The case for Defendant Tammy, as stated in Tammy's "Post-Trial Proposed Findings of Fact" is that "[a]t no time did the defendant [Tammy] agree to guarantee her sister's investment in the Film, nor did she agree to be financially responsible for her loss of investment." Doc. 40-1, at ¶ 24 (citing Doc. 39, at 255, 314-15, 343). As noted *supra,* Tammy's Post-Trial Brief expands on that denial:

> The plaintiff [Laurie] was constantly writing, texting, or calling her sister [Tammy] to express her frustration and fear about the film production company's failure to provide her with definitive information about the film's financials. If her sister had guaranteed her investment, there would be no need for such panic, nor would there have been any reason for the plaintiff to complain she had been scammed by the film production company and her lawyer. *In truth, however, there was no kitchen agreement.* The reason the plaintiff was panicked was she did not like the answers she was getting from the production company about when she would receive a return on her investment.

Doc. 40, at 11 (emphasis added).

**B.   Resolution of Main Issue**

As the post-trial fact finder, I am confronted with irreconcilable differences between the these two sisters' accounts of the main issue in question: whether Tammy personally guaranteed repayment of the investment on *Angel of Mine* and, if so, whether that guarantee was given without the exercise of reasonable care, inducing Laurie to invest and thus rely to her detriment – whether there was a negligent misrepresentation. Only if Tammy gave such a guarantee must the Court address whether that guarantee formed a contract which was breached, and then whether Tammy transferred the Redondo Property with the intent, actual or constructive, to avoid the legal debt she allegedly owes Laurie – *i.e.*, to hinder, delay or defraud Laurie by making the transfer.

Neither Laurie nor Tammy profess a relevant uncertainty or failure of recollection. Laurie states with total certainty that Tammy guaranteed repayment of Laurie's $350,000 investment with the movie producers during a telephone conversation between the two sisters as early as April 3, 2018; and further, that Laurie would not have made her investment if Tammy had not given that guarantee. Tammy states in equally positive fashion that she never agreed to guarantee repayment of or be financially responsible for Laurie's loss of her investment, either prior to Laurie making the investment or at any time thereafter. The issues resulting from these conflicting accounts go to the heart of the case.

To resolve the case as finder of the facts, I am required to assess the credibility of these two individuals. If I could perceive no basis for regarding one more credible than the other, the litigation would probably be resolved against the party bearing the burden of proof on the issue in question.

However, that circumstance does not arise because my consideration of the evidence in its entirety leads me to accept the account of events given by Tammy as accurate. I find the relevant facts accordingly.

Specifically, I hold that during that period in April 2018, when Laurie was considering and then investing $350,000 with the non-party movie producers, Tammy said nothing to Laurie which promised or implied that Tammy would return that investment to Laurie if the producers failed to do so. I accept Tammy's testimony that at that earlier time, Tammy had no significant assets with which to make such an investment or guarantee, or any personal interest in entering into such a transaction. Tammy made the investment prospect known to her sister Laurie, whose own wealth and evident interest in backing movies resulted in her prompt investment of $350,000 with the producers of *Angel of Mine*. There is no plausible reason to believe that at the time Laurie made that

investment with non-parties, her sister Tammy guaranteed she would repay it if the investment became worthless (a possibility Laurie specifically acknowledged, and which in fact came to pass). I find that Tammy did not make any such undertaking in April 2018. Accordingly, Tammy made no negligent representation in April 2018 regarding repayment of the funds to Laurie, so there was no justifiable reliance by Laurie on any such representation.

We turn now to November 2019. The case becomes more complicated because Tammy acknowledges that she sent Laurie an email dated November 19, 2019, which commented on the movie producers' delay in repaying Laurie's investment and then said:

> I still do think you will get paid back. I can make no promises as to what happens with these producer payouts as I, like you, am being kept in the dark about what's going on. What I can promise you is that you WILL get paid back. If the movie fund doesn't pay you back by next Christmas (not this Christmas but Christmas 2020) I will personally pay you all the money you are owed.

Pl. Ex. 3. Then, on January 20, 2021, Tammy sent Laurie an email which stated: "Will hopefully maybe be able to pay you end of month from my part time income." Pl. Ex. 7

Not surprisingly, Laurie interprets Tammy's communications (admittedly made by her) as giving rise to a binding contract – one which obligated Tammy to repay Laurie's entire $350,000 investment (the movie producers continuing in their failure to do so).

I am unable to accept that theory of the case. In *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206 (2d Cir. 2023), the Second Circuit said: "Under the law of contract, a promise is generally not enforceable unless it is supported by consideration. Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." 79 F.4th at 228–29 (citations and internal quotation marks omitted). In the case at bar, consideration

16

in that sense is not pleaded. Tammy contends that she did not intend by the quoted language in her letters to promise to pay $350,000 to Laurie. It is difficult to read the language as Tammy does; but in any event, the case presents a total *absence of consideration* to support such a promise, and in consequence, Laurie has no enforceable claim against Tammy for breach of contract.

It thus follows that the transfer of the Redondo Property was not designed to avoid any debt owed to Laurie. There is thus no viable claim for fraudulent transfer against Tammy, individually, and/or with Bartholomew Saunt, as Trustee of the Saunt Family Trust.

That conclusion entitles Defendants Tammy and the Trustee of the Saunt Family Trust to a dismissal of all causes of action in Plaintiff Laurie's Second Amended Complaint [Doc. 25].

### IV.  CONCLUSION

For the foregoing reasons, the Court enters Judgment as follows:

The Clerk of the Court is directed to enter JUDGMENT in favor of Defendants, and against Plaintiff, dismissing the Second Amended Complaint [Doc. 25] WITH PREJUDICE in its entirety. In the exercise of its discretion, the Court makes no order with respect to costs, and each party will bear its own.

It is SO ORDERED.

Dated:  New Haven, Connecticut
        March 4, 2025

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT. JR.
Senior United States District Judge